IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA17-270

Filed: 1 August 2017

Buncombe County, Nos. 15 JA 341-43

IN THE MATTER OF: R.S., A.S., C.S.

Appeal by respondent-father from orders entered 23 September and 4 October 2016 by Judge Susan M. Dotson-Smith in Buncombe County District Court. Heard in the Court of Appeals 11 July 2017.

> *Hanna Frost Honeycutt for petitioner-appellee Buncombe County Department of Health and Human Services.*
>
> *Amanda Armstrong for guardian ad litem.*
>
> *Peter Wood for respondent-appellant father.*

MURPHY, Judge.

Respondent-father ("Floyd") [1] appeals from the trial court's order adjudicating his son "Ryan," an abused and neglected juvenile and from the resulting dispositional order leaving Ryan in a safety placement with his maternal grandmother. By order entered 5 April 2017, this Court allowed Respondent-mother's ("Emily") motion to withdraw her appeal. We now affirm the orders of the trial court.

## Background

---

[1] We adopt pseudonyms to protect the juveniles' identities.

Ryan was born prematurely in late September 2015. After leaving the hospital on 1 October 2015, he lived with Floyd and Emily (collectively "Respondents") and Emily's two older children, "April," born in March 2008 and "Chris," born February 2010. April and Chris share a biological father, "Mr. A."

On 22 October 2015, Buncombe County Department of Health and Human Services ("BCDHHS") received a Child Protective Services ("CPS") report that Ryan, then approximately four weeks old, was admitted to Mission Hospital emergency room with a torn lingual frenulum, the tissue connecting the tongue to the floor of the mouth. Ryan was also diagnosed with failure to thrive, weighing less than he did at birth.

Dr. Cynthia H. Brown, a pediatrician and child abuse expert, examined Ryan and spoke to Respondents at the hospital. Though confirming they were Ryan's only caretakers, Respondents disclaimed any knowledge of the cause of Ryan's injury and stated that Emily first noticed a dark scab under his tongue the day before his admission. Because Ryan's lingual frenulum tear would have resulted in significant bleeding, Dr. Brown found it unusual that Respondents did not notice his injury. She further noted that "significant force" would be have been required to cause the injury. A skeletal survey and abdominal ultrasound performed on Ryan were negative for additional trauma. Dr. Brown recommended repeating the skeletal survey after two

weeks. Ryan was discharged from the hospital on 25 October 2015, having showed consistent weight gain during his stay.

On 29 October 2015, Respondents brought Ryan to Dr. William L. Chambers, "to evaluate the infant to see if the injury under the tongue could have been self-inflicted." Dr. Chambers advised Respondents it would not be possible for Ryan to have caused the tear in his frenulum. Dr. Chambers scheduled a follow-up appointment for Ryan, which Emily later cancelled.

BCDHHS received a second CPS report on 9 November 2015 after Ryan's second skeletal survey revealed three healing fractures on his 11th and 12th ribs and a healing fracture on his right tibia. Dr. Burdette Sleight, an expert in pediatric radiology, concluded that the fractures were approximately three weeks old on 9 November 2015 and thus were present when Ryan was admitted to the hospital with the torn frenulum on 22 October 2015. Subsequent calcification had made the fractures more conspicuous on the x-ray at the time of the follow-up survey. Respondents were again unable to explain Ryan's injuries. They refused to allow additional diagnostic tests recommended by Dr. Brown to check Ryan for brain damage or other injuries.

On 23 November 2015, BCDHHS filed a juvenile petition alleging that Ryan was abused and neglected. After a three-day hearing in July 2016, the trial court

entered an order adjudicating Ryan abused and neglected on 23 September 2016.[2] The trial court conducted a separate dispositional hearing on 18 August 2016 and entered its initial disposition on 4 October 2016. The trial court left Ryan in Respondents' custody but sanctioned the child's continued placement with the maternal grandmother. The trial court ordered Floyd to submit to a parenting capacity evaluation and attend a parenting course approved by BCDHHS.

On appeal, Floyd claims the trial court erred by basing its adjudication of abuse on Respondents' failure to provide an innocent explanation for Ryan's injuries. He contends the trial court improperly shifted the burden of proof from BCDHHS to the Respondent-parents, in violation of N.C.G.S. § 7B-805 (2015). Floyd argues that "[a] parent is not required to present evidence that shows he or she did not abuse a child."

## Analysis

We review an adjudication of abuse, neglect, or dependency under N.C.G. S. § 7B-807 (2015) to determine whether the trial court's findings are supported by "clear and convincing competent evidence" and whether the findings, in turn, support the trial court's conclusions of law. *In re Helms*, 127 N.C. App. 505, 511, 491 S.E.2d 672, 676 (1997). Uncontested findings of fact are "presumed to be supported by competent evidence and [are] binding on appeal." *Koufman v. Koufman*, 330 N.C. 93, 97, 408

---

[2] The trial court also adjudicated April and Chris neglected. However, Emily has withdrawn her appeal in this cause, and Mr. A. did not appeal. Therefore, April and Chris' cases are not before us for review.

S.E.2d 729, 731 (1991). We review a trial court's conclusions of law de novo. *In re J.S.L.*, 177 N.C. App. 151, 154, 628 S.E.2d 387, 389 (2006).

"Abused juvenile" is defined, *inter alia*, as one whose parent or caretaker "[i]nflicts or allows to be inflicted upon the juvenile a serious physical injury by other than accidental means." N.C.G.S. § 7B-101(1) (2015). The determination that a child meets the statutory definition of an abused juvenile is a conclusion of law. *In re Ellis*, 135 N.C. App. 338, 340, 520 S.E.2d 118, 120 (1999); *In re Hughes*, 74 N.C. App. 751, 759-60, 330 S.E.2d 213, 219 (1985).

The trial court made detailed findings of fact regarding the nature and causes of Ryan's injuries, based on the expert testimony of Drs. Chambers, Sleight, and Brown.[3] Among these findings are the following:

> 19. The injury to [Ryan]'s lingual frenulum would have been a very painful injury and would have resulted in a significant amount of bleeding . . . The Respondent parents' statement that they did not observe any substantial bleeding or pain associated with [Ryan]'s torn frenulum is not credible.
>
> . . . .
>
> 23. The injury to [Ryan]'s frenulum would have taken a lot of force to cause, and could not have been caused by [Ryan]. The injury to [Ryan]'s frenulum was caused by some object being inserted into [his] mouth with considerable force.

---

[3] Respondents adduced the expert testimony of Dr. John Kelly, a family physician whom respondents chose as Ryan's primary care doctor beginning on 15 November 2015. The trial court found that "[t]he testimony of Dr. Chambers, Dr. Sleight and Dr. Brown was more credible and consistent than Dr. Kelly's testimony about the non-accidental nature of [Ryan]'s injuries, and the failure to thrive."

There is no medical condition that would have caused [his] frenulum to tear spontaneously. [Respondents] failed to provide an explanation for [Ryan]'s torn frenulum.

24. The injury to [Ryan]'s lingual frenulum was inflicted.

. . . .

31. [Ryan]'s rib fractures are consistent with injuries caused by squeezing forcibly. Significant force was applied to cause [his] rib fractures. This would have been painful for [Ryan]. [Ryan]'s rib fractures are inflicted injuries.

32. The November 9, 2015 skeletal survey also revealed a healing corner fracture on [Ryan]'s tibia. Based on the stage of healing, the tibia fracture was approximately three weeks old.

33. Moderate to significant force would have been required to cause the corner fracture to [Ryan]'s tibia. The injury would have been painful initially . . . . The corner fracture was caused by violent shaking or grabbing and jerking. Normal handling of [Ryan] would not have caused the corner fracture to [Ryan]'s tibia. The corner fracture is an inflicted injury.

34. [Ryan]'s bone scan did not reveal any issues with bone density, and it is unlikely that an underlying medical condition, such as osteogenesis imperfecta, contributed to [his] injuries.

35. . . . [Respondents] had no reasonable explanation of causation for [Ryan]'s broken bones.

. . . .

47. [Respondents] delayed meetings between the social worker and the [older] children, delayed and limited medical tests, and appear to have omitted information.

48. [Respondents] still have not provided explanations for [Ryan]'s numerous, serious injuries.

49. A torn lingual frenulum, rib fractures and tibia fracture are all serious injuries. These serious injuries occurred by other than accidental means.

50. [Ryan] could not have caused the injuries to his frenulum, ribs or tibia . . .

51. [Ryan]'s injuries are consistent with child abuse in a pre-mobile infant.

52. These serious injuries occurred while [Respondents] were the only caretakers for [Ryan].

53. [Respondents] are jointly and individually responsible for [Ryan]'s injuries.

. . . .

58. [Ryan] has been subjected to abuse . . . by [Respondents] . . . , who are adults who regularly live in the home.

As Floyd does not contest the evidentiary support for any of the trial court's findings of fact, they are binding on appeal. *See Koufman*, 330 N.C. at 97, 408 S.E.2d at 731.

The trial court found Ryan sustained a torn lingual frenulum and multiple bone fractures, all of which are "serious injuries" and were "inflicted" upon the infant child "by other than accidental means." It further found that Respondents are adults who live in the home and are responsible for his injuries. These findings support a conclusion that Ryan is abused under N.C.G.S. § 7B-101(1). *In re Y.Y.E.T.*, 205 N.C.

App. 120, 128-29, 695 S.E.2d 517, 522-23, *disc. review denied*, 364 N.C. 434, 703 S.E.2d 150 (2010); *Hughes*, 74 N.C. App. 751, 758-59, 330 S.E.2d 213, 218 (1985).

We find no merit to Floyd's claim that the trial court's adjudication of abuse amounts to an improper shifting of the burden of proof to Respondents. The circumstances surrounding Ryan's injuries, as proved by BCDHHS and recounted in the trial court's findings, support a reasonable inference that Ryan sustained his injuries at the hands of Respondents, his only caretakers. Where "different inference[s] may be drawn from the evidence, [the trial court] alone determines which inferences to draw and which to reject." *Hughes*, 74 N.C. App. at 759, 330 S.E.2d at 218. Moreover, "[a]s the child's sole care providers, it necessarily follows that Respondents were jointly and individually responsible for the child's injury. Whether each Respondent directly caused the injury by inflicting the abuse or indirectly caused the injury by failing to prevent it, each Respondent is responsible." *Y.Y.E.T.*, 205 N.C. App. at 129, 695 S.E.2d at 522-23. Here, following the holding in *Y.Y.E.T.*, Ryan's parents were the sole caretakers of a pre-mobile infant who suffered serious, yet unexplained injuries, and the trial court's finding that the parents were responsible for those injuries was entirely appropriate.

Further, Floyd's claims that this case is comparable to *In re J.A.M.,* ___ N.C. App. ___, 795 S.E.2d 262 (2016) come from an incorrect reading of that case and its holdings. *In re J.A.M.* speaks to a very different set of facts, in which the child was

removed from the home and then adjudicated based on past domestic violence without any evidence of ongoing domestic violence. In this case, there are clearly, as found by the trial court and recorded above, findings of current and ongoing domestic violence.

## **Conclusion**

As the trial court properly concluded that Ryan was an abused individual and that the parents were responsible for those injuries, we affirm the court's orders.

AFFIRMED.

Judges Bryant and Hunter, Jr. concur.